The board made separate errors in the two final written decisions covered in this appeal, and I'll start with the claim construction error. The board departed from the plain meaning of the term fused image with a point of view of the wide camera when it narrowed the term point of view to require both wide shape and wide position point of view. The specification at column 5 describes shape and position as two different aspects of point of view, and then goes on to detail how a fused image can have combinations of shape and position point of view. And specifically at column 5, line 13 to 15, the system output image can have the shape and position of either sub camera image or the shape and or position of a combination thereof. The specification never says that to qualify as having a wide point of view, an image must have both wide shape and wide position. Instead, it uses point of view to refer to either shape or position. Where does the specification ever use the word point of view generically, where it's clear that they're talking about just one of those two things? Because sometimes the spec says wide perspective point of view, and sometimes it says wide position point of view, but does it ever refer to point of view generically, you know, the broader category, and in that mean either just one of those two? So I would say in the sentence starting at line 13, that the system output image... It was going to column 5? Yes, column 5. Yeah, thank you. So it's appendix 66, column 5, lines 13 to 15. That sentence, that the system output image can have the shape and position of either sub camera image or the shape or position of a combination thereof. What's that, what that is... I meant expressly, where there's a sentence that uses the word point of view and then refers to just shape or just position. Is there any such thing? I don't think there is. So in our view, the sentence that covers line 25, in fused images, it is possible to register tele-image pixels to a matching pixel set, in which case the output image will retain the wide point of view, wide fusion. In our view, that retains only wide position and not wide shape. Because in that sentence, it is just talking about registering from the tele-image into the wide image, which is exactly what Prugleski teaches. Now, Core Photonics says that that sentence actually retains shape and position. And the way that they get there is by using figure 5 and the last steps in figure 5 regarding error correction to say that once you've performed the error correction steps, that necessarily retains shape and position. Is the figure 5 the process for registering? Yes, that's right. And that's the figure that the board relied on to say that when you refer to wide point of view, the only way to qualify for having wide point of view is to have shape and position. That violates principles of claim differentiation because the final two steps in figure 5 that are required to retain wide shape are claimed in claims 5 and 6 that depend from claim 1. So by requiring wide point of view to include shape and position, the board has essentially imported claims 5 and 6 into claim 1. Is it important to your argument on claim construction that we're talking about fused images? And I think related to that, if it was not a fused image, it was just a single image, would position and perspective have to go together? Yes, that's exactly right, Judge Dart. So in the first sentence in this paragraph on column 5, it talks about if you're looking at just a single camera image. So necessarily, if you take an image from one camera lens, that will have the shape and position of that lens. But when you get to a fused image, you're combining data from two different lenses, so you can have this mixed point of view, which is what this invention is trying to capture, is how you use the tele and the wide lens to enhance or change the image effects of an image captured from two different lenses. So Apple's construction covers a much broader aspect of this invention. It covers an image that has mixed points of view from a wide camera and a tele lens, instead of restricting the claims to just wide shape and wide position. And that's what the claims cover. As your Honor pointed out, the claims are about looking at the fused image and what is the point of view reflected in that fused image. In this, do you agree that the language around lines 10 through 14 sounds definitional? We don't agree with that. The standard for a definition is that it has to be clear and clearly express the intent to define. Would you agree with me that if the paragraph didn't say anything else, and this is all it said, that that might be more clear intent? If the sentence ended after this is referred to as point of view, that would be clearer. However, the next sentence completely undoes that. I understand. I understand. It's a tough issue. I'll be honest with you. I think this is a really hard issue. And the board itself said that the specification is not a model of clarity, right at appendix 11. So we can't find a definition in here. It's not clear. It doesn't meet the standard for re-defining. If it is definitional, does that help you or hurt you? This, I would think, is singular. So does that undermine your position or does that help your position? And by this, I'm referring to the this in the specification. Right. Honestly, I would say it's somewhat neutral. I don't agree that it's lexicography, but because at best this definition is talking about point of view from a single sub-camera and is not talking about point of view of a fused image, it doesn't provide that much information on how to interpret the claim language, which talks about the fused image. One other question, which is, I understand that core photonics is taking the position that wide position point of view and wide perspective point of view are not subsets of point of view. How do you respond to that and why? So I think you can think about it in a few different ways. They could be subsets of point of view. You could think about them as ways to qualify as calling something with a wide point of view. So you could say, this image has a wide point of view because it has a wide perspective. Or as an analogy, I could say, I have Scottish heritage because my father is Scottish. You can't say, I can't claim Scottish heritage because only one of my parents is Scottish. So those are separate and independent ways to qualify as having wide point of view. So when the claims use wide point of view without specifying one or the other, it gives you the option of having both. And that's reflected in column five when it talks about images that have different combinations of wide and tele point of view. And in figure five, when it goes through the steps of creating a fused image. And if you don't perform the final two error correction steps, you end up with an image that has only wide position and not wide shape. If we were to agree with you on the claim construction, we would have to remand to the board to apply it and to reach secondary considerations, wouldn't we? So we think it would be appropriate to reverse because if you accept our claim construction, there's no dispute that the first three grand factors are fully in favor of Apple. Core Photonics never argued there was no motivation. Even if you were right about that, there is a fourth factor and all you say is usually the fourth factor doesn't outweigh the other three, but we can't just decide that ourselves, can we? You could decide that Apple's prima facie case of obviousness was so strong that it wasn't outweighed by the fourth grand factor. We are not fact finders, right? If you're not comfortable with that, a remand would be appropriate. And then the boards, the only question for the board would be the secondary considerations question. Ms. Moten, you referred to column five. I'm curious as to what the last sentence in this paragraph we've been focused on means. The sentence that says, it is also possible to perform the registration after either subcamera image is shifted, in which case the output image will retain the respective wide or teleperspective point of view. What does that sentence mean and how does it relate to what we've been trying to sort out here? Sure, so this is talking about if you first shift one of the sub-images so that you're getting closer to a matched position point of view and then you then register pixels. In Apple's view, that will retain both shape and position point of view. So you'll be looking at an image that's much closer to the original wide image that's just been enhanced with some of the telepixels. Core Photonics says that this last example actually only retains wide position and does not retain wide perspective. They say that that's because you first shift and then cut and paste essentially from the teleimage into the wide image. And so when you're doing that, you're taking the teleimage pixels without any error correction. So then you would import more telepixels into this fused image. But either way, the way that both of us are reading this paragraph, I think that the first example in this paragraph retains both shape and position. Core Photonics thinks the second example in the paragraph retains shape and position. So either way, we agree that some of the examples in this paragraph in column five have mixed points of view. So in other words, some of the examples in this paragraph we're talking about, some of them have just one of the two, either perspective or position point of view for the wide camera. Yeah, exactly. Which supports Apple's construction, which would then cover more embodiments from the specification. Do you want to talk about your second issue, which is the, I think you allege, an APA violation? That's right. So in this second IPR, the board's finding that there was no reasonable expectation of success in scaling Ogata's lens to fit into Perulski's camera was both a new argument and is not supported by substantial evidence. So the board's decision relied on what it called two errors in Dr. Sazian's. You are in your rebuttal time. Unfortunately, I just want to let you know, I haven't asked you a question, so I'm willing to give you a little more time on this. But but I would like to ask you specific questions on this, which is we're very familiar with the facts. Right. So your position, I think, is that the board couldn't rely on this as a basis for reasonable success, reasonable expectation of success. For maybe two reasons. One is because no one argued it. And maybe the second one is because reasonable expectation of success doesn't require anything besides what's in the claim. And the change of the ABI number, if it impacted anything, wasn't anything that had anything that was required by the claim. Right. I'll just restate it how I would say it. So there was an APA violation in elevating the ABI number mistake into a case dispositive issue when no one argued that. And then separately, there's a substantial evidence problem based on the aspherical coefficients, which the board called that an error when it was not an error. And then based on the ABI number, the board said entering the wrong ABI number meant that the ZMAX analysis was not didn't support Dr. Sazian's conclusion. That is unsupported by substantial evidence because neither expert. Why can't the board say you made an error? Therefore, your entire analysis is not credible, not reliable. So the board never made any kind of credibility finding. There was no dispute that you should use the ZMAX analysis and then look at the outputs of that analysis. The board did say it was unreliable. They did say it was unreliable. And they pointed to the error that had been pointed out to you by a patent owner as the basis for that unreliability finding. Right. That's right. But there were a few steps missing in that. So no one ever said that the ABI number error had any impact. But why does why is that necessary? I have the same question as Judge Stoll. The board's a fact finder. An error had been pointed out to them. Aren't they free to say even if no one asked them to? We are so troubled by this error that it makes all of the analysis you're relying on unreliable. So that conclusion that it made all of the analysis unreliable is not supported by substantial evidence because Dr. Moore, Core Photonics' expert, said this ABI number error affects certain parameters and it makes those parameters not accurate. That's at Appendix 932. I guess I think it's the same question is. Is a fact finder not permitted to be essentially colloquially scared off from relying at all on an expert once an error in that expert's analysis is pointed out? Even if it's maybe not, in your view, a big error, maybe it's not even a big error in your friend on the other side's view. But but they're the fact finder. Aren't they free to decide this is such a big error? I'm staying away from this expert. So if they explained or if they actually found this is a big error and this actually matters to the scalability analysis, maybe. But they never told no one ever told no one ever said either the experts in the arguments to the board that this was an error in this that would actually affect the scalability analysis. These scalability. Your view is just to make sure I understand. I think it was a reasonable expectation of success because that's what the board said. The reasonable that they couldn't rely on Dr. Sazian's theory for reasonable expectation of success. That wasn't enough. It didn't satisfy the burden. And reasonable expectation of success is a particular inquiry that requires that you would be reasonably expect success in combining the two making the scalability change. Right. And so I think what your point is, is that the error that was made is not related to something that is recited in the claim. Or didn't impact anything recited in the claim. That's correct. Yes. Right. So the error went to these parameters, the field curvature and OPD fan plots. But it had nothing to do with the parameters that the experts were actually debating whether that would make for a usable lens or not. So those were parameters. What are those parameters? I mean, there is no evidence whatsoever in the record. There's three things you've mentioned. I think two of them. Maybe a field of curvature, distortion, and optical path difference. But what are those things? Do they impact the manufacturability or the scalability of the lens? They do not. So the parameters that actually mattered were the F number, field of view, and manufacturing tolerances. That's at appendix 4803. So those were the parameters that Dr. Moore and Dr. Sazian were actually debating whether... I understand. But can I go back to my first question? I apologize. I think I asked you too. What is field of curvature? What is distortion? What is optical path difference? Do you know? So those parameters are about the physical shape of the lens. And then the ABBA number is about the material and how light refracts through that material. So when you enter different ABBA numbers and then you analyze these field of curvature and distortion plots, those plots will look different depending on which material you've made the lens out of. Okay. So when I see distortion, that's not distortion of the image. Well, I think it would be because it's distortion of how the light passes through the lens and then hits the sensor. But in all of these lenses, there's a range of acceptable outcomes. So you can say that you want your outputs of the ZMAX software will fall within a range. And as long as they're within a certain range, it's still an acceptable lens. And so that's what Dr. Sazian and Dr. Moore were debating, is whether the outputs of the ZMAX analysis would be acceptable or not to a person of ordinary skill. Okay. I think we're going to—you've had enough time. Thank you for all your answers. And let's hear from Mr. Fenster now on these issues. Good morning, Your Honors. May it please the Court, my name is Dr. Raphael Lee. If you would like to stay with the last issue, I'm happy to. I do want to get to the claim construction. But I can give you substantial evidence and answer the Court's—your question about distortion directly. So first, the Board's decision that reasonable expectation of success was not supported because of the error is supported by substantial evidence. Specifically, they cite to Dr. Moore's analysis at Appendix 4798. And where they cite to it is at Appendix 39. They say, because of this error, Dr. Sazian's field curvature distortion and OPD— I'm sorry, what page are you on? I apologize. I apologize. No, no, I missed it. This is Appendix 39. Thank you. Okay. Because of this error, Dr. Sazian's field curvature distortion and OPD fan plots do not accurately reflect the performance of a scaled version of Ogata's lens. And they go on to say, citing Dr. Moore again, that a significant change in the index of refraction or the Abbe number can change a highly performing lens design into an unacceptable design. Now, was Dr. Moore there in that paragraph that's cited, paragraph 88? Was he actually talking about specifically the expert's mistake, Dr. Sazian's mistake, with respect to the Abbe number? Or was that more generically stated? It wasn't generic. It wasn't specifically about that point in paragraph 88. So in paragraph—the first citation to Dr. Moore is at Appendix 4798 at paragraph 62. That one is specifically to the Abbe number. Paragraph 88 is talking about scaling a different lens, Kawamura. And he talks about the effect of the Abbe number and refraction on the lens performance. And this goes directly to reasonable expectation of success. So do you agree that reasonable expectation of success is—our case law says that you have to have a likelihood of success in combining the references? And it's got to be the claimed invention. There's a reasonable expectation of success that the invention will be combined and that it will operate as intended once combined. Not that they will operate as intended once combined. Sure. So the reasonable expectation of success—the reason this goes to reasonable expectation of success is when you put these lenses together, the OPD fan plots and the distortion, what happens with the fan plots is as the light rays come through the various lenses, they get bent. And if they converge on the sensor in one point, it's a successful lens. If they scatter the light, then it's a blurry image. And that's the distortion. And so the fan plots, as my friend acknowledged, really do determine whether or not it's a successful lens or not. You didn't present any evidence on this. The argument wasn't presented to the board at all. There was no evidence at all. In fact, you guys didn't rely at all on the Abbe number discrepancy in order to bolster your reasonable expectation of success argument, which is based on an inability to manufacture. So we pointed out the error in the analysis. We pointed out that it affects whether or not—that it renders unreliable his entire lens software design. Where did you do that, by the way? This is at POR 31. Is it in our appendix? It is. And this is cited— Okay, so at appendix 39, it cites to our POR 31, which is at appendix 932. At 932, I don't see where you say that. I'm looking at appendix page 932. And it's not in the section that it's—my understanding is that this is just from, like, a background section from your POR. The last sentence of that, Your Honor, is because of this error, the field curvature distortion and fan plots do not accurately reflect the performance of a scaled version. That doesn't say do not accurately reflect performance, and therefore there's no reasonable expectation of success. It just says do not accurately reflect. I'm sorry. Nor does it say their whole expert analysis is unreliable. You never make that argument. We didn't specifically make that argument. That's correct. We said that that renders his analysis that you can't rely on—that his fan plots are no longer accurately depict. But you didn't say other things are no longer accurate, just the field curvature distortion and fan plots. Well, those are all how well the lens performs and whether one of skill in the art would understand that you can scale. The question here was whether you can scale a 35-millimeter lens down to a miniature by a factor of six. There was a lot of argument in the record that we put in Dr. Moore's declaration and in our POR that you can't scale it that much with a reasonable expectation of success. Sometimes we have claims that come before us in this reasonable expectation issue. Like, say, in a pharmaceutical case, it would say for treating cancer or something like that. I don't see anything in these claims that have that kind of end goal in them. Instead, it's just a product, a dual aperture digital camera for imaging an object or scene. And so what is—that's my problem with the reasonable expectation of success is that I don't think it's very—I think what's required to show in this case, and you can tell me why I'm wrong, what I think is required to show is simply that if you modify—that you could scale and you could result—the result would be a camera that satisfies the claim limitations. But there's no requirement that it be a great operating—that it be an ultimately very good operating camera. So the question is whether one would take this big lens and put it into Perulski. Out of all the lenses out there in the world, why would one of skill in the art be motivated to take this big lens and scale it down and have a reasonable expectation that it would perform well? Okay, reasonable expectation being different from motivation, yes. Yes. Okay, all right. That's right. And so the point here was that there was substantial evidence to support the board's factual determination that they didn't meet their burden of showing that this scaled-down version of Ogata would perform as expected with a reasonable expectation of success. But what is it that you think is expected? What is the reasonable expectation of what? Fill in the blank for me. Like I said, there's an example for treating cancer. That's pretty clear. There should be a reasonable expectation that the combination will treat cancer. Here, what is it there's supposed to be a reasonable expectation of? You're saying that you would scale it down. That it would take a proper image. That what? It would take a proper image. One of skill in the art building a lens is not just putting a bunch of pieces of glass together and saying, yeah, I can do this and it meets the requirements, but it doesn't—I can't see you through it. It has to be a well-performing lens in order to provide motivation for one of skill in the art to want to combine them in the first place. I'd like to leave it at there is substantial evidence for that and move on to the claim construction unless you have further questions on that. Okay. So on the claim construction issue, this really is—so two points here. One, it's totally consistent with the intrinsic record, and my friends have asserted without evidence that the way the specification defines point of view generally, point of view as opposed to perspective or position, is inconsistent with the plain meaning. It's not, and there's no evidence that it is. So the plain meaning of from one camera versus another, when I view you from this vantage point, you'll have a certain shape and position. If I view you from this vantage point, you'll have another shape and position. That's what the paragraph says. That is the plain meaning of point of view. Mr. French, in the claim, the subparagraph E, the very last part of it, talks about the camera controller further operative to output the fused image with a point of view of the wide camera. Yes. With a point of view of the wide camera. Okay. What does that mean? So first of all, A versus B, this is a new argument that was never made below. Second, they're reading too much into A. A is the first, it's the article that you use in patent language when you introduce a concept for the first time. Just like up above where it says A field of view, FOV wide or A field of view tele. Here, this is the first time point of view is being introduced. So that's why it's saying A point of view. But it is consistent, the patent is absolutely consistent that every time it talks about point of view generally, it is talking about both shape and position, namely the vantage point from the camera. It never, ever, to your question, Judge Stoll, it never uses point of view generally to refer only to perspective point of view or only to position point of view. And the way they're trying to read this claim is by saying that instead of saying a wide point of view consistent with the specification, they're trying to read in either or both of the wide perspective point of view or wide position point of view. Can I ask you a question? Sure. This is an analogy. Okay. So let's say that my workout involves 30 minutes of cardio followed by 20 minutes of weights. And I say that's what my workout is. But what if I do 30 minutes of cardio? Did I work out? Did I do a workout? So if you said months, if you defined, if the general plain meaning of a workout included both cardio and weights, and you said if you do cardio, I do a cardio workout. And if I do weights, I do a weight workout. But if I do a workout, I do both, which is basically what the specification says. Then your question would be... That's a little contrary or ordinary English language, isn't it? I mean, I think it really goes to whether wide perspective point of view and wide position point of view are actually subsets of point of view. They're not subsets. They're different concepts. So what it says is, and the specification uses point of view consistently. There are other examples at column four, lines 51 to 52, where it talks about fusing from an object or scene from a particular point of view. And then at column 10, lines 37 to 42, it talks about the dual aperture camera switches between sub camera at four points of view. So every time it talks about point of view generally, it's talking about the vantage point of the camera, which has both shape and position. I may have strayed from your question, Judge Stoll, but the point here is that... No, you're saying why you think they're not subsets. That's right, because the point of view refers to both. And then it says, in the context of fusing, I can separate these two things. And when I do, I'm going to be specific and talk about the wide perspective point of view or the wide position point of view. But doesn't the right construction have to capture those latter embodiments, where you take perspective from one image and you take position from the other image? Does this claim have to encompass all embodiments? Is that your question? Doesn't the claim construction that is proper in this case have to capture all of those embodiments? I think that the claim construction has to be consistent, properly construed. It is true that this claim, Claim 1, will not capture all embodiments. It's limited to those with a wide point of view and doesn't, for example... So Column 5 claims wide fusion and telefusion. Wide fusion, where you have a wide point of view, both shape and position. Telefusion, where you have both tele, right? Claim 1 doesn't claim tele at all. But my understanding was under your construction, which is what the board agreed to, Claim 1 also won't capture all of the wide point of view embodiments. It won't cover the combination. And that's totally consistent. Right. On what basis would we exclude that embodiment in Claim 1? Sure. So the plain meaning of POV and let me just take you through one particular section. So at Column 5, it starts off, the first two sentences define point of view as shape and position. Then it goes through and talks about you can have combinations. Then, and this gets to the wide fusion definition. So infused images. This is at line 24, Column 5, line 24. It says infused images, it's possible to register tele-image pixels to a matching pixel set within the wide, in which case the output will retain the wide point of view and they call this wide fusion. Now, if you go to Paragraph 1E of Claim 1 that Judge Stoll was asking about earlier, that's exactly what this is talking about. This is at Column 13, lines 45 to 50. So it says further operative to output a fused image with a point of view of the wide camera by mapping tele-image pixels to matching pixels within the wide image. So this is the specific embodiment. This claim is drawn to the specific embodiment of wide fusion, where you retain the wide point of view, both shape and position, by registering tele-pixels into and only using those that match the wide image. How do you read the last sentence of this paragraph at lines 30 to 34? Sure, at Column 5? Yeah. Okay. I mean, is that a fused view? Like, do you have something with a wide point of view, like wide position point of view with tele-perspective? This is referring to a combination. So it talks after the shift, then there's a registration, and when you have the registration, that's what gives you either the wide or tele-perspective. So this is saying that you could have either, depending on whether it's before or after the shift, either position, and depending on which way you register it, it could have either the tele or the wide perspective. But this is the combination kind of discussion. Can I ask you why, then, if this is a combination, meaning that you could have one, you just have, say, a wide position point of view, why, I mean, this sentence here uses the phrase, well, it says perspective. Perspective. Exactly. That's exactly the point. And it's consistent in doing so. The only time perspective or position point of view appear is in that paragraph of Column 5. Nowhere does position or perspective point of view appear elsewhere in the entire patent, I'm certain. I'm a little confused on whether you're arguing lexicography or not. I think I heard you say today this is just the plain and ordinary meaning. So the answer is I absolutely believe that the first two sentences define it. My point is that it's not defining away from the plain meaning. It's consistent with the plain meaning. So I do think that it is an express definition. I don't think that it's inconsistent with the plain meaning. Did you argue to the Board that this was lexicography? We certainly did. So, Your Honors, we did that in the POR, so this is at Appendix 287, and I didn't use the word lexicography. I said define or expressly define, so to be fair. So at Appendix 287 in the POR, we said that 479's patent discussion of POV defines it with respect to shapes and positions. In the CER reply at Appendix 413 and 414, we said the 47 patent defines POV. And then in the transcript at the oral hearing before the Board, I said three times at Appendix 600 I argued express definition, and the appendix at 623 and 625 I argued express definition. But again, it's a definition that's not inconsistent with the plain and ordinary meaning. That's right. There's no evidence from Apple or anyone else that the plain meaning is different. No. Ms. Moulton said one of the things she said is that these sentences really are referring to the point of view of a single camera at this point, so it's not really helpful for thinking about used images. What's your response to that? My response is that point of view doesn't have different definitions when it's talking to a camera point of view or in fused. It has to be used consistently throughout, and it is in the specification. So it defines it at the first two sentences of Column 5. It uses it consistently with fused images. In fused images, where you can separate the two aspects, it uses specific language, the perspective POV and position fused. Thank you. Okay, thank you. Thank you. Ms. Moulton, I'm going to restore two minutes of your rebuttal time. Thank you. So on the claim construction issue, I think there's actually quite a bit of agreement that point of view refers to shape and position, that those are two different aspects of point of view, and nothing in the claims requires both. Council said that position and perspective are not in the claims. They're only in that passage in Column 5. So because the claims don't limit themselves to either shape or position, point of view should be understood to cover either or both aspects of shape and position.  Yes, I just remind the court that the board's conclusion on reasonable expectation of success was infected by two errors, both the error about the ABBA number and the board's finding that this aspherical coefficient issue, that that was an error in Dr. Stasion's analysis when that was not an error at all. So that alone requires a remand for the board to determine whether it would reach the same conclusion on reasonable expectation of success without those non-errors. Thank you. Thank you.